Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
01/09/2026 08:06 AM CST

State of Nebraska, appellee, v. Rickey R.
Cartwright, appellant.

___ N.W.3d ___

Filed January 9, 2026.    No. S-24-295.

1. **Trial: Evidence: Appeal and Error.** Balancing the probative value of evidence against the danger of unfair prejudice is within the discretion of the trial court, whose decision an appellate court will not reverse unless there is an abuse of discretion.

2. **Appeal and Error.** An appellate court may find plain error on appeal when an error unasserted or uncomplained of at trial, but plainly evident from the record, prejudicially affects a litigant's substantial right and, if uncorrected, would result in damage to the integrity, reputation, and fairness of the judicial process.

3. \_\_\_\_. To be considered by an appellate court, the party asserting the alleged error must both specifically assign and specifically argue the error in the party's initial brief.

4. **Evidence: Words and Phrases.** Evidence is probative if it tends in any degree to alter the probability of a material fact.

5. \_\_\_\_: \_\_\_\_. The weight of probative value involves a measurement of the degree to which the evidence persuades the trier of fact that the particular fact exists and the distance of the fact from the ultimate issue of the case.

6. **Rules of Evidence.** The fact that evidence is prejudicial is not enough to require exclusion under Neb. Rev. Stat. § 27-403 (Reissue 2016), because most, if not all, of the evidence a party offers is calculated to be prejudicial to the opposing party; it is only the evidence that has a tendency to suggest a decision on an improper basis that is considered unfairly prejudicial under § 27-403.

7. **Evidence: Words and Phrases.** Unfair prejudice speaks to the capacity of some concededly relevant evidence to lure the fact finder into declaring guilt on a ground different from proof specific to the offense charged, commonly on an emotional basis.

8. **Evidence: Other Acts: Convictions.** When considering whether evidence of the defendant's other acts is unfairly prejudicial, courts consider whether the evidence tends to make conviction of the defendant more probable for an incorrect reason.

9. **Other Acts.** It is considered "unfair" to introduce other acts that are relevant only through the inference that the defendant is by propensity a probable perpetrator of the crime.

10. ____. Bad acts have fair probative value to the extent there is a rational chain of inferences that does not require an evaluation of character.

11. ____. The comparative enormity or reprehensible nature of the uncharged to the charged acts is one consideration in determining unfair prejudice of the uncharged act.

12. **Criminal Law: Evidence.** A suspect's threats against someone who has or might cooperate with the authorities investigating a crime is generally admissible as evidence of consciousness of guilt.

13. **Criminal Law: Evidence: Proof.** Consciousness of guilt evidence is logically relevant to establish a defendant's guilty knowledge of the charged crime.

14. **Appeal and Error.** A defendant cannot complain of error the defendant invited the court to commit.

15. ____. Except for instances of plain error, only those issues both raised or passed upon below and specifically assigned and specifically argued on appeal in the party's initial brief will be considered by the appellate court.

16. **Appeal and Error: Words and Phrases.** Plain error is a higher bar than an abuse of discretion and is an error plainly evident from the record and of such a nature that to leave it uncorrected would result in damage to the integrity, reputation, or fairness of the judicial process.

Petition for further review from the Court of Appeals, Moore, Bishop, and Welch, Judges, on appeal thereto from the District Court for Douglas County, Molly B. Keane, Judge. Judgment of Court of Appeals reversed and remanded with directions.

Theodore C. Turnblacer, Jr., of Dornan, Troia, Howard, Breitkreutz, Dahlquist & Klein, P.C., L.L.O., for appellee.

Michael T. Hilgers, Attorney General, and P. Christian Adamski for appellant.

Funke, C.J., Cassel, Stacy, Papik, Freudenberg, and Bergevin, JJ.

Freudenberg, J.

## INTRODUCTION

We granted further review of the Nebraska Court of Appeals' decision[1] reversing the defendant's conviction of third degree sexual assault of a child. The question presented is whether it was unduly prejudicial for the jury to hear testimony that, after the victim's brother verbalized the victim had told him that the defendant sexually assaulted her, the defendant physically attacked the brother and threatened to kill him if he repeated the accusation. Pursuant to a partial grant of the defendant's motion in limine, the jury did not know the brother also said that he saw the defendant inappropriately touching another sibling. The Court of Appeals held that the omission left the jury with a distorted and misleading representation that the defendant reacted solely to an accusation involving the victim, which was not harmless beyond a reasonable doubt. We reverse the Court of Appeals' decision and remand the cause with directions.

## BACKGROUND

In August 2022, Rickey R. Cartwright's 5-year-old biological daughter (the victim) disclosed to her older brother, A.R., who was 10 years old, that Cartwright sexually abused her when they had recently spent the night at Cartwright's house. The victim also reported the abuse to her mother, Kia R.

Cartwright and Kia's relationship had ended before the victim was born, and, at the time of the incident, Cartwright was living with his girlfriend, their three young children, and L.B., who is the girlfriend's daughter from another relationship. Cartwright did not have a formal custody arrangement for the

---

[1] See *State v. Cartwright*, No. A-24-295, 2025 WL 1088204 (Neb. App. Apr. 8, 2025) (selected for posting to court website).

victim and A.R., but Kia allowed him to exercise parenting time. Kia testified that sometimes Cartwright would not bring back the children when he had agreed to and that Cartwright did not allow Kia to know where he lived or what his phone number was.

The day after the victim reported the abuse to Kia, Cartwright went to Kia's home to discuss the matter and physically assaulted and threatened A.R. after A.R. "spoke up." Kia did not contact law enforcement until approximately a month after the incident.

Following an investigation, Cartwright was charged with first degree sexual assault of a child, a Class IB felony, and third degree sexual assault of a child, a Class IIIA felony. A jury found Cartwright guilty of third degree sexual assault of a child but not guilty of first degree sexual assault of a child. The district court sentenced Cartwright to 3 years' imprisonment and 18 months of post-release supervision with credit for 520 days previously served. Cartwright appealed to the Court of Appeals, which reversed the conviction and remanded the cause for a new trial.

## Pretrial Motion in Limine

Before trial, the State filed a notice of intent to offer evidence pursuant to Neb. Rev. Stat. § 27-404 (Cum. Supp. 2024) and asked the court to rule in limine that testimony surrounding the confrontation at Kia's home was admissible. Specifically, the State sought to adduce that Kia confronted Cartwright about the victim's accusation while in the presence of the victim and A.R. and that when A.R. voiced accusations, Cartwright became angry and slapped A.R., picked A.R. up and threw him against the wall, punched A.R. in the ribs, and made a verbal threat to kill A.R. if he repeated what he said.

Defense counsel moved in limine to exclude evidence of any alleged prior bad acts against A.R., Kia, or L.B., arguing such acts were not relevant or admissible pursuant to Neb. Rev. Stat. §§ 27-401 and 27-402 (Reissue 2016), and § 27-404,

unless Cartwright first put them at issue. Defense counsel further argued that any acts against A.R., Kia, or L.B. would be more unfairly prejudicial to Cartwright than probative, pursuant to Neb. Rev. Stat. § 27-403 (Reissue 2016).

For purposes of the motions, the court received Kia's deposition testimony that described the confrontation leading to the assault of A.R. In her deposition, Kia said that after the victim reported Cartwright had sexually assaulted her, Kia was not sure if she believed the victim. Kia called Cartwright to her house so the victim could repeat to Cartwright what she had reported to Kia. Kia asked A.R. to be part of the conversation because, after the victim made the report to Kia, A.R. "started saying things."

Kia testified in her deposition that, at the meeting, the victim refused to speak, so A.R. eventually told Cartwright what the victim had reported to him. According to Kia, Cartwright was not in a good mood from the start, but Cartwright began "flipping out" after A.R. voiced the accusation that Cartwright had sexually assaulted the victim. In response, A.R. told Cartwright he had seen Cartwright inappropriately touching L.B., at which point, Cartwright "snapped." Kia testified Cartwright "flipped out screaming and yelling," grabbed A.R. by his arms and was yelling in his face, "smacked" A.R. in the face, and threw A.R. up against the couch. Cartwright stopped when Kia threatened to call law enforcement and when the family dog intervened. As Cartwright left, he threatened, "[I]f you ever tell anybody else that, I'm going to kill you."

Defense counsel asserted the prejudice from the jury's hearing evidence of these acts would outweigh any probative value, because they occurred only after A.R. accused Cartwright of having inappropriate contact with L.B. According to defense counsel, because the assault and threat followed most closely in time to the accusation that he sexually assaulted L.B., Cartwright's bad acts were "divested from any response that could be attributed to the allegation" relating to the victim.

Defense counsel also said the defense "strongly object[ed] to any evidence about [L.B.] coming in because it's not charged . . . and it's not part of this case." Defense counsel described any alleged acts of misconduct by Cartwright against L.B. as "Part 3" of its motion in limine. At the same time, defense counsel noted the issue may not be ripe because the State had not filed a motion to adduce at trial evidence of bad acts against L.B.

The State agreed with the defense that any statements concerning abuse by Cartwright against L.B. would be inadmissible and clarified it was not intending to offer such evidence. Discussion between the court and counsel indicated that no charges had been brought in relation to an alleged sexual assault of L.B. The State disagreed with the defense's argument that Cartwright's actions toward A.R. during the confrontation at Kia's house were unattributable to the accusation that he had sexually abused the victim—as opposed to the accusation that he had sexually abused L.B. The State noted both accusations were made within the same short timespan.

The State argued Cartwright's reaction at Kia's house after being accused of abusing the victim was probative of Cartwright's knowledge and consciousness of guilt. The State set forth in its motion that Cartwright's acts were inextricably intertwined with the evidence and with expected testimony concerning the assaults on the victim and were relevant and material to help establish Cartwright's identity as the person responsible for the alleged offenses, to show Cartwright's knowledge regarding the alleged offenses, and to present as full of a picture as possible of the events surrounding the incidents themselves.

The court pronounced it was sustaining "Part 3" of defense counsel's motion in limine regarding any bad acts against L.B. and it was denying the defense's motion to exclude evidence of Cartwright's behavior toward A.R. during the confrontation at Kia's house. It granted the State's motion to adduce the same. The court found the evidence of Cartwright's reaction

to the accusation of sexually abusing the victim was relevant and its probative value outweighed the risk of unfair prejudice. The court further found Cartwright's reaction was "inextricably intertwined with the circumstances making up the underlying allegations and is admissible under [§] 27-404(2)." The court then said, "The evidence that the Court has deemed admissible may be used for the limited purposes of showing identity, [Cartwright's] knowledge of the allegations, and the state of mind of [Cartwright]."

In its written order, the court reiterated that the State could adduce evidence and testimony that, after the victim disclosed to Kia that Cartwright was sexually assaulting her, Kia confronted Cartwright about the accusation while in the presence of A.R. and that, after Cartwright was confronted, A.R. made statements and Cartwright physically assaulted and threatened A.R. However, "No evidence of the particular statements made by A.R. prior to the physical altercation shall be elicited and no reference to any other allegations of sexual abuse by [Cartwright] on any other child shall be admitted." Further, "Any other bad acts, outside the circumstances of the altercation at the time of the confrontation regarding the alleged victim's disclosure, are inadmissible."

## Trial

The victim was 6 years old at the time of trial. She testified she has "two dads," Cartwright and a man referred to as "Vail." Vail was listed as the victim's father on the victim's birth certificate. The victim did not learn Cartwright was her biological father until she was 3 years old.

The victim testified that when visiting Cartwright at his new house, referred to as the "blue house," Cartwright told her to go downstairs to the basement. In the basement was Cartwright's bedroom, a living area, and a bathroom. Cartwright told her she was allowed there but the other children were not; she testified the rules were different for her. While she was standing in the living area of the basement,

Cartwright pulled down her pants and underwear and touched her vaginal area with his hand. Her testimony was unclear as to whether this happened more than once. The victim testified Cartwright told her not to tell anyone that he had "touched my private." Despite that, the victim reported Cartwright's actions to her mother, "[b]ecause he did something important to me."

On cross-examination, the victim testified she had only been at Cartwright's house twice. The victim conceded she used to get her two fathers "mixed up." She also "[k]ind of" sometimes confused Cartwright with a man referred to as "Book," a friend of Kia's who is the victim's godfather. The victim was impeached with prior deposition testimony that Cartwright had never touched her private part but that Book had. She said, "Yes," when defense counsel asked her if "anybody's going to be upset with you if you came in here today in front of all your friends and family and said that [Cartwright] did not touch you?"

A nurse practitioner at a child advocacy center who is certified as a sexual assault nurse examiner conducted an interview and medical examination of the victim after Kia called law enforcement to report the abuse. She testified at trial that the victim said her "'dad,'" whom the victim later identified as Cartwright, pulled her pants down and "'be squeezing my booty . . . rubbing it and squeezing it'" with his hand. The victim reported this happened more than one time and she was scared. A physical examination of the victim did not reveal any injuries.

A forensic interviewer at the same child advocacy center laid foundation for a video recording of the victim's forensic interview, which occurred in conjunction with the medical examination. The video was entered into evidence and published to the jury, with any references to Cartwright's assault of and threat toward A.R. redacted.

In the interview, the victim described how her "dad" had asked her to go to the basement while everyone else was

upstairs. When asked the name of her "dad," the victim said, "Vail," but immediately corrected herself and said, "Rickey." The victim said that while she was standing, her father went down to his knees, pulled down her pants, and pulled down his own pants. The victim said her father pulled his "private part" up. She then demonstrated how her father made thrusting motions. The victim said her father repeatedly asked her to suck his private part like she sucks her thumb. The victim said she held his private part in her hand, but she kept scooting back when he tried to get his private part closer to her mouth. Her father eventually pulled his pants back up. When questioned if the incident occurred with Vail or Cartwright, the victim said it was Cartwright, noting that Vail was in jail.

A.R. testified at trial that Cartwright and his girlfriend moved into the blue house shortly after their youngest child was born and that he and the victim went there only once or twice. At the blue house, he was not allowed to go to the basement. In contrast, Cartwright allowed both the victim and L.B. to go downstairs. A.R. said the victim would be downstairs for 15 to 30 minutes. Cartwright let the victim go downstairs "[a] lot."

A.R. testified that when they were back at Kia's house, the victim told him what had happened when she went downstairs with Cartwright at his house. The victim woke A.R. up to tell him about it, and he testified she sounded scared or confused. A.R. told Kia, "[a]nd then that was when my sister run in there and tell her too that what happened." Kia testified the victim told her something about Cartwright that caused her concern, and Kia was "in disbelief." She did not want to believe the victim because Kia had known Cartwright "for so long. He's been around my other children."

Kia testified she called Cartwright's mother the next morning and asked her to come to her house to see if the victim would tell her grandmother the same thing she told Kia. Instead, Cartwright called Kia. Kia let the call go to

voicemail. The voicemail was entered into evidence and published to the jury. In the voicemail, Cartwright sounded upset, describing an accusation of "some weird shit" and insisting that Kia call him back.

After the victim and A.R. arrived home from school that day, Cartwright visited Kia's house. Kia testified she did not know Cartwright was coming over. Cartwright, Kia, A.R., and the victim were all present in the living room and sat down to have a conversation about what the victim had reported.

Kia told the victim to "speak up" and repeat the accusation, but the victim would not. Instead, she hid herself behind Kia. At that point, Cartwright "was starting to get upset." A.R. testified he eventually "spoke up" about his concerns about Cartwright and the victim. Over defense counsel's objection, A.R. testified that, after Cartwright heard what A.R. said, he "jumped up . . . and then, like, picked me up and then punched me and threw me onto the couch and then . . . walked out [of] the house." A.R. further testified, over defense counsel's objection, that, as Cartwright was walking out, he said he would kill A.R., and A.R. testified he felt scared.

Kia affirmed that after Cartwright was confronted about what the victim had said, Cartwright appeared to be "[i]n angry shock." Kia testified that, at first, Cartwright was "talking and yelling. He was, like, basically argumentative about it. And then he physically grabbed my son; he grabbed [A.R.], physically grabbed [A.R.] and hit [A.R.] and threw [A.R.] on the couch."

Kia testified she told Cartwright to leave. Before he left, Cartwright yelled in A.R.'s face, "'If you ever tell anyone else that, I will kill you.'" Kia testified A.R. was not physically injured but he was upset and crying.

Kia conceded on direct that she did not call law enforcement to report the victim's accusation of sexual abuse until about a month later. She explained she was trying to protect her children. On cross-examination, defense counsel adduced testimony about the contentious nature of her relationship

with Cartwright, especially with respect to his exercise of visitation.

In closing argument, the State reiterated that Cartwright had directed the victim not to tell anybody about the sexual assault and that Cartwright had threatened to kill A.R. if "'you ever say that again,'" "after [Cartwright] was confronted about [the victim's] disclosure."

The defense suggested in closing argument that the victim was confused about which "dad" had sexually assaulted her and argued Cartwright's "strong denial" when confronted with accusations of sexual assault indicated he was innocent. The defense also pointed out Kia's delay in contacting law enforcement about the victim's disclosure, pointing out that it "was out there since August all the way to September 19th, and it—it was being handled within the family."

## Assignments of Error and Arguments to Court of Appeals

As relevant to further review, Cartwright assigned on appeal that the district court abused its discretion by "receiving evidence of other wrongs or bad acts, as the evidence was received in violation of Neb. Rev. Stat. § 27-403." Cartwright did not assign or argue the district court erred by overruling his § 27-404 objection or finding the uncharged acts were inextricably intertwined with the charged crimes and relevant and admissible to show identity, knowledge of the accusations, and Cartwright's state of mind.

Cartwright argued the evidence was inadmissible under § 27-403 because the fact that he "became upset when he was accused of a child sexual assault is not evidence that supports guilt"[2] and "[t]he subject matter of this testimony was not related to the charges in the case, and it was inflammatory, and very prejudicial."[3] Cartwright concluded the evidence "should

---

[2] Brief for appellant at 15.

[3] Id.

have failed the § 27-403 balancing test."[4] Cartwright did not argue that the exclusion of any reference to the accusation concerning L.B. made the evidence misleading or that he was precluded from adducing such evidence. Indeed, Cartwright did not mention L.B. in his appellate brief at all.

## Court of Appeals' Decision

The Court of Appeals held that the district court abused its discretion in admitting uncharged acts over Cartwright's § 27-403 objection, because the assault and threat were presented to the jury as reactions related solely to the accusation that Cartwright had sexually assaulted the victim. The Court of Appeals concluded that, by omitting the accusation as to L.B., the evidence presented a distorted and misleading representation of what really occurred. The Court of Appeals also said it was speculation which accusation Cartwright was reacting to or if he was reacting to both. It concluded that it was impossible to bifurcate A.R.'s accusation while fairly and accurately presenting that Carwright's reaction related solely to an accusation involving the victim. Therefore, the Court of Appeals concluded the evidence was unfairly prejudicial and the unfair prejudice outweighed its limited probative value. The Court of Appeals found that the error was not harmless beyond a reasonable doubt and reversed Cartwright's conviction and remanded the cause for a new trial.

We granted the State's petition for further review.

## ASSIGNMENT OF ERROR

On further review, the State assigns that the Court of Appeals erred in holding that the district court abused its discretion in admitting evidence of Cartwright's assault of A.R.

## STANDARD OF REVIEW

[1] Balancing the probative value of evidence against the danger of unfair prejudice is within the discretion of the trial

---

[4] *Id.*

court, whose decision we will not reverse unless there is an abuse of discretion.[5]

[2] An appellate court may find plain error on appeal when an error unasserted or uncomplained of at trial, but plainly evident from the record, prejudicially affects a litigant's substantial right and, if uncorrected, would result in damage to the integrity, reputation, and fairness of the judicial process.[6]

[3] To be considered by an appellate court, the party asserting the alleged error must both specifically assign and specifically argue the error in the party's initial brief.[7]

## ANALYSIS

We hold that the district court did not abuse its discretion in finding the probative value of Cartwright's assault of and threat toward A.R. after being accused of sexually assaulting the victim outweighed the danger of unfair prejudice from these uncharged acts. Thus, the court did not err in admitting the testimony of the assault and threat over Cartwright's objection under § 27-403.

[4,5] Section 27-403 provides that when evidence is relevant, it "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Under § 27-401, "Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evidence is probative if it tends in any degree to alter the probability of a material fact.[8] The weight of

---

[5] *State v. Rush*, 317 Neb. 622, 11 N.W.3d 394 (2024), *modified on denial of rehearing* 317 Neb. 917, 12 N.W.3d 787, *disapproved on other grounds, State v. Rupp, ante* p. 502, 28 N.W.3d 74 (2025).

[6] *State v. Childs*, 309 Neb. 427, 960 N.W.2d 585 (2021).

[7] See *State v. Garcia*, 315 Neb. 74, 994 N.W.2d 610 (2023).

[8] *State v. Dixon*, 240 Neb. 454, 482 N.W.2d 573 (1992).

probative value involves a measurement of the degree to which the evidence persuades the trier of fact that the particular fact exists and the distance of the fact from the ultimate issue of the case.[9]

[6,7] The fact that evidence is prejudicial is not enough to require exclusion under § 27-403, because most, if not all, of the evidence a party offers is calculated to be prejudicial to the opposing party; it is only the evidence that has a tendency to suggest a decision on an improper basis that is considered unfairly prejudicial under § 27-403.[10] Unfair prejudice speaks to the capacity of some concededly relevant evidence to lure the fact finder into declaring guilt on a ground different from proof specific to the offense charged, commonly on an emotional basis.[11]

[8,9] When considering whether evidence of the defendant's other acts is unfairly prejudicial, courts consider whether the evidence tends to make conviction of the defendant more probable for an incorrect reason.[12] We have recognized "[t]he admission of other acts evidence presents a special danger of confusion of the issues and undue prejudice,"[13] which is relevant to whether the evidence is unfairly prejudicial under § 27-403. Section 27-404 merely codifies the common-law tradition that, even if logically persuasive, it is unfairly prejudicial for the State to ask a jury to infer the defendant committed the charged crime because the defendant is a "bad person" who is likely to act in conformity with such bad character[14] or to encourage the jury to "subconsciously penalize the defendant for the proven misdeeds . . . even if [the defendant]

---

[9] See *State v. Boswell*, 316 Neb. 542, 5 N.W.3d 747 (2024).

[10] *Id*.

[11] *State v. Price, ante* p. 1, 26 N.W.3d 70 (2025).

[12] See *id*.

[13] *State v. Oldson*, 293 Neb. 718, 746, 884 N.W.2d 10, 39 (2016).

[14] See, e.g., *State v. Oldson, supra* note 13.

should happen to be innocent momentarily."[15] It is considered "unfair" to introduce other acts that are relevant *only* through the inference that the defendant is "by propensity a probable perpetrator of the crime."[16]

[10] Bad acts have fair probative value to the extent there is a "rational chain of inferences that does not require an evaluation of character."[17] The "litmus test is noncharacter logical relevance of the other acts"[18]; i.e., that the bad acts are not admitted for propensity purposes.[19] Thus, we have said uncharged acts evidence will usually have permissible probative value when related in time, place, and/or circumstances to the offense or offenses charged.[20]

Cartwright argued in his appellate brief that becoming upset when falsely accused of child sexual assault had little probative value of his guilt, because that was a normal and understandable reaction by an innocent person under the circumstances. At the same time, Cartwright asserted in a conclusory manner that the evidence was "inflammatory" and "very prejudicial."[21] Cartwright was not prejudiced to the degree the jury inferred his assault and threat reflected his innocence. Inasmuch as the jury could have engaged in propensity reasoning, we hold that the evidence had sufficient "fair" probative value to outweigh that danger.

[11] We evaluate the danger the jury would use unfair propensity reasoning to convict Cartwright of sexual assault by

---

[15] *State v. Oldson, supra* note 13, 293 Neb. at 747, 884 N.W.2d at 39 (internal quotation marks omitted).

[16] *Id*. at 746, 884 N.W.2d at 38 (internal quotation marks omitted).

[17] *Id.* at 748, 884 N.W.2d at 39 (internal quotation marks omitted).

[18] *Id.* at 749, 884 N.W.2d at 40 (internal quotation marks omitted).

[19] See *State v. Oldson, supra* note 13.

[20] See *State v. Moore*, 317 Neb. 493, 10 N.W.3d 531 (2024).

[21] Brief for appellant at 15.

considering the "[c]omparative enormity"[22] of the uncharged acts to the charged crimes of first and third degree sexual assault of a child. The comparative enormity or reprehensible nature of the uncharged to the charged acts is one consideration in determining unfair prejudice of the uncharged act.[23] Cartwright's physical attack of and threat toward A.R. was reprehensible, but Kia testified A.R. was not injured. Cartwright's violent outburst and threat toward A.R. was comparatively much less reprehensible than the charged acts of first and third degree sexual assault of a child.

Weighed against such minimal danger of unfair prejudice is the substantial nonpropensity probative value of Cartwright's assault of and threat toward A.R. It was rational to infer Cartwright threatened A.R. so that A.R. and the witnesses to the threat would not go to law enforcement to report the victim's accusation of abuse. And Cartwright's preceding violence is rationally tied to that threat because it strengthened A.R.'s fear, as well as that of the victim and Kia, that reporting the accusation and cooperating with law enforcement could put them in physical danger.

[12,13] As the court found, the evidence was ultimately probative of Cartwright's identity as the perpetrator. A suspect's threats against someone who has or might cooperate with the authorities investigating a crime is generally admissible as evidence of consciousness of guilt.[24] Consciousness of

---

[22] See 22B Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure § 5259 at 428 (2d ed. 2017) (internal quotation marks omitted). See, also, *Herbert v. State*, 526 So. 2d 709 (Fla. App. 1988) (Glickstein, J., concurring in part, and in part dissenting); *State v. Larsen*, 512 N.W.2d 803 (Iowa App. 1993); *State v. Williams*, 548 S.W.3d 275 (Mo. 2018); *Freer v. State*, 533 P.3d 897 (Wyo. 2023).

[23] See, 22B Wright & Graham, Jr., *supra* note 22; Demetria D. Frank, *The Proof Is in the Prejudice: Implicit Racial Bias, Uncharged Act Evidence & the Colorblind Courtroom*, 32 Harv. J. on Racial & Ethnic Just. 1 (2016).

[24] 3 Clifford S. Fishman & Anne Toomey McKenna, Jones on Evidence Civil and Criminal § 17:58.50 (Nov. 2025 update).

guilt evidence is logically relevant to establish a defendant's guilty knowledge of the charged crime.[25] The guilty knowledge, in turn, serves as an intermediate inference to prove the defendant's "identity." That is, guilty knowledge is an intermediate inference that the defendant is the perpetrator of the charged crime.[26]

Cartwright's violent outburst and threat was probative to explain why Kia waited approximately 1 month before contacting law enforcement about the victim's report of sexual abuse. *State v. Baker*[27] is analogous. In a trial on charges of first degree sexual assault and third degree sexual assault of a child, we held in *Baker* that the trial court did not err in admitting evidence that the defendant had threatened and physically assaulted the mother of the victim in that case, because the assaults and threats were part of the coherent picture of the crimes charged and were specifically relevant to explain the failure of either the victim or her mother to make a prompt complaint.[28]

During Cartwright's trial, defense counsel adduced in cross-examination that there was a 1-month delay from the time of the victim's report and any contact with law enforcement. This was reiterated in closing argument. The defense insinuated Kia contacted law enforcement as a way of avoiding further difficulties with Cartwright over visitation and not because she truly believed Cartwright had committed the crime. The evidence of the attack of and threat toward A.R. was relevant to support the different inference that Kia delayed reporting the assault because she was scared.

We disagree with defense counsel's argument, made to the trial court and vaguely reiterated on appeal, that the assault

---

[25] *State v. Oldson, supra* note 13 (Connolly, J., concurring).

[26] *Id*.

[27] *State v. Baker*, 280 Neb. 752, 789 N.W.2d 702 (2010).

[28] See *id.* See, also, e.g., *People v. McAlpin*, 53 Cal. 3d 1289, 812 P.2d 563, 283 Cal. Rptr. 382 (1991).

of and threat toward A.R. was not probative of the charged crimes because it related solely to the accusation Cartwright sexually assaulted L.B. The evidence at the pretrial hearing and at trial shows Cartwright was upset before any accusation of an additional victim was made. Furthermore, both the accusation that Cartwright sexually assaulted the victim and that he sexually assaulted L.B. occurred within the same short confrontation. The accusation as to L.B. was not the sole impetus for the assault of and threat toward A.R. simply because it was the accusation that was marginally closer in time. In finding the assault and threat admissible, the trial court necessarily found that Cartwright was, at a minimum, reacting to both accusations and that he was not reacting solely to the accusation regarding L.B. We disagree with the Court of Appeals' reasoning that such a finding was mere speculation.

As for the lack of a complete picture of the impetus for Cartwright's reaction, defense counsel did not argue to the trial court or in his appellate brief that omitting the accusation that Cartwright sexually assaulted L.B. was misleading or otherwise unduly prejudicial. To the contrary, defense counsel sought to exclude any evidence of the accusation concerning L.B. through his motion in limine, and the court granted that portion of the motion. Defense counsel never argued at the hearing on his motion in limine that Cartwright would be prejudiced if the full context of the accusations leading to his assault and threat were not adduced at trial. And, at trial, defense counsel never attempted to adduce such contextual evidence.

[14-16] A defendant cannot complain of error the defendant invited the court to commit.[29] Further, except for instances of plain error, only those issues both raised or passed upon below and specifically assigned and specifically argued on appeal in the party's initial brief will be considered by the appellate court.[30] Because it was neither argued below nor on

[29] See *State v. Dixon*, 286 Neb. 157, 835 N.W.2d 643 (2013).

[30] *State v. Price, supra* note 11.

appeal, it is a matter of plain error review whether the evidence of the assault and threat were inadmissible due to the misleading nature of the omission of the accusation regarding L.B. Plain error is a higher bar than an abuse of discretion and is an error plainly evident from the record and of such a nature that to leave it uncorrected would result in damage to the integrity, reputation, or fairness of the judicial process.[31]

There are obvious reasons defense counsel chose not to try to admit evidence that Cartwright had been accused of assaulting L.B., but the danger of misrepresentation by omitting such additional context did not render Cartwright's assault of and threat toward A.R. inadmissible. It was a strategic choice for the defense to make whether it was more prejudicial to include the accusation from A.R. or to keep it out. Cartwright cannot gain the categorical inadmissibility of his violent threat to silence his accuser simply because he was accused of sexually assaulting two children instead of only one. Any misrepresentation or lack of a coherent picture stemming from the omission of the accusation regarding L.B. did not rise to the level of plain error.

## CONCLUSION

The Court of Appeals erred by holding that the district court erred by admitting the testimony of Cartwright's assault of and threat toward A.R. We reverse the decision of the Court of Appeals and remand the cause with directions to affirm Cartwright's conviction and sentence.

REVERSED AND REMANDED WITH DIRECTIONS.

---

[31] See *State v. Dat*, 318 Neb. 311, 15 N.W.3d 410 (2025).