IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


STATE V. JACOB


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


STATE OF NEBRASKA, APPELLEE,

V.

TIMOTHY JACOB, APPELLANT.


Filed March 17, 2026.    No. A-25-312.


Appeal from the District Court for Douglas County: PETER C. BATAILLON, Judge. Affirmed.

Jason E. Troia, of Jason Troia Law, for appellant.

Michael T. Hilgers, Attorney General, and Teryn Blessin for appellee.


MOORE, BISHOP, and WELCH, Judges.

MOORE, Judge.

### INTRODUCTION

Timothy Jacob appeals from his convictions in the district court for Douglas County of second degree assault and use of a weapon (not a firearm) to commit a felony. On appeal, he assigns error to the sufficiency of the evidence to support his convictions and the court's denial of his motion for new trial. Jacob also argues that the court imposed excessive sentences. Finding no error, we affirm.

### STATEMENT OF FACTS

The charges in this case arose out of an incident on September 10, 2022, in which Jacob injured Greg Petersen with a machete. On November 15, the State filed an information in the district court, charging Jacob with second degree assault, in violation of Neb. Rev. Stat. § 28-309

- 1 -

(Reissue 2016), a Class IIA felony, and use of a deadly weapon (not a firearm) to commit a felony, in violation of Neb. Rev. Stat. § 28-1205(1)(b) (Reissue 2016), a Class II felony.

A bench trial was held before the district court on February 3, 2025. The State presented testimony from the police officer who interviewed Petersen at the hospital following the incident and another officer who photographed the scene and Petersen's injuries; Petersen; an employee of Petersen's; and Jacob's girlfriend. The court received exhibits offered by the State, including numerous photographs documenting the scene and Petersen's injuries; the machete, text messages exchanged by Jacob's girlfriend and Petersen, before and near the time of the incident; and video from a police interview of Petersen at the hospital. Jacob testified on his own behalf.

The evidence shows that Dawn Inzauro and Jacob were dating but not getting along at the time of the incident. Sometime before the incident, Inzauro drove her vehicle into Jacob's pickup repeatedly, damaging it. Jacob agreed not to file an insurance claim for this damage, and Inzauro agreed to pay for the repairs once Jacob submitted the costs to her. She also rented another vehicle for Jacob to drive in the meantime. The damaged pickup was stored in the garage at a house that had been owned by Inzauro's mother (who had died prior to the incident).

The victim, Petersen, had done handyman work for both Inzauro and her mother. At the time of the incident, Inzauro was preparing to sell the house, and Petersen was doing some work on it at Inzauro's request in preparation for an upcoming open house.

At some point, Inzauro also asked for Petersen's help in removing the damaged pickup from the premises prior to the open house and in repairing the pickup. Inzauro communicated with both Jacob and Petersen about removal and repair of the pickup prior to the incident. The evidence shows Jacob and Inzauro were not in complete agreement as to how the removal and repair were to be accomplished, and that by the morning of the incident, Jacob's own plan for the pickup differed from the plan being communicated to Petersen by Inzauro. Jacob and Petersen had an encounter at the house on September 9, 2022, followed by the incident the morning of September 10, 2022, during which Jacob wounded Petersen with a machete. We summarize further relevant details as follows.

Inzauro testified about her communications with both Jacob and Petersen about the pickup. Inzauro confirmed that she asked Petersen to either help fix the pickup or tow it from the property before the open house, and she asked Jacob to drop off the pickup keys at the house. Inzauro testified that she and Jacob were "arguing" in their communications. She noted that Jacob did not want someone he did not know well or trust working on the pickup, and she did not want the repairs "going on [her] insurance." Jacob confirmed that he and Inzauro had discussed involving Petersen in the removal and repair of the pickup. He testified that he had not agreed with that plan because he did not trust Petersen to work on the pickup. Inzauro acknowledged that she did not do a good job in sharing her communications to Petersen with Jacob, and vice versa, but she thought she had "made it very clear" to Petersen that she and Jacob were arguing and that Jacob was upset.

Petersen testified to his understanding that Jacob was supposed to be dropping off the pickup keys at the house on September 9, 2022. According to Petersen, when Jacob arrived at the house that day, he stopped the rental vehicle on the street and yelled through the window. Petersen walked into the street, opened the driver's side door, and asked him if he had the keys for the pickup. Petersen testified that Jacob slammed the door shut and drove away without leaving the

keys. According to Jacob, he did not drop off the pickup keys that day because Petersen's actions in "rushing" to the rental vehicle and "demanding" the keys "startled" and "scared" him.

Petersen then texted Inzauro to let her know he did not receive the keys, after which he resumed his work at the house. Petersen testified that he and Inzauro "just figured [Jacob] wasn't going to bring [the pickup keys] so [they] were trying to line up a tow truck to get it towed out [the next day]." Because Inzauro was concerned that Jacob might return and damage the landscaping or cause other damage around the house, Inzauro asked Petersen to stay at the house that night. Inzauro was not then staying there herself, and she believed some prior damage to the garage wall at the house had been caused by Jacob. Petersen did not stay at the house that night, but he left his work van parked there to hopefully deter Jacob from damaging the property.

On September 10, 2022, Petersen returned to the house with his employee, Mason Stapp. When Petersen and Stapp arrived that morning, Jacob was already there. He had backed the rental vehicle into the driveway and was parked in front of the three-car garage. Stapp pulled his vehicle into the driveway and parked facing the rental vehicle. Inzauro had alerted Petersen to Jacob's presence at the house. Based on his communication with Inzauro, Petersen believed that Jacob had called Inzauro's insurance company and was waiting for an appraiser to come and look at the pickup. Petersen also believed that Inzauro had an active protection order against Jacob and that Jacob was not supposed to be on the property. According to Inzauro, she had sought a protection order against Jacob at some point but "asked to have it revoked" shortly after she "submitted it," which was "[q]uite a bit prior" to September 10. She did not recall telling Petersen that there was a protection order.

Petersen, Stapp, and Jacob all testified about the ensuing verbal and physical altercation between Jacob and Petersen. Petersen exited Stapp's vehicle and approached Jacob, who got out of the rental vehicle. Stapp remained in his vehicle during the verbal portion of the altercation. Petersen testified that he told Jacob he was not supposed to be on the property, and they began yelling at one another. According to Petersen, he and Jacob remained about 5 feet apart during the verbal altercation. He denied being "in . . . Jacob's face" while yelling at him or making any threats to Jacob. Stapp did not hear Petersen make any threats to Jacob or see Petersen "get physical" with Jacob. According to Petersen, Jacob wanted to see his pickup, so Petersen walked past Jacob and approached one of the garage doors to enter the access code. He testified that his back was turned to Jacob, and he heard Stapp yell "look out." Stapp confirmed yelling at Petersen when he saw the machete.

Jacob testified that he returned to the house on September 10, 2022, because he had arranged for a towing company to tow his pickup and he expected Inzauro to meet him at the house to let him in the garage. He testified that he was not expecting Petersen to be there. According to Jacob, Petersen used profanity when he asked what Jacob was doing at the house and that Petersen told him the pickup was no longer in the garage. Jacob also claimed that Petersen threatened to kill Jacob if Jacob continued to refer to Petersen as Inzauro's "boyfriend" (something Jacob had joked about with Inzauro in the past). Jacob testified that he then told Petersen he was going to call the police and file an insurance claim. Jacob testified that he turned to the rental vehicle to grab his cell phone, but Petersen said, "oh, no, you're not," and grabbed Jacob's shoulder in an apparent attempt "to throw [Jacob] down." According to Jacob, he proceeded to the rental vehicle to retrieve his phone, but when he saw the machete on the floor on the passenger side, he grabbed it instead

and stepped back out of the rental vehicle. We note that the machete was "a double-sided blade," with one edge being serrated.

Jacob denied going to the house on either September 9 or 10, 2022, with the intention of physically assaulting someone, and he denied having the machete in the rental car to physically hurt someone. Jacob admitted that he had intended to use the machete to cut down some plants and bushes in the front yard of the house to hurt Inzauro's feelings. Jacob testified that he displayed the machete on September 10 and asked Petersen to let him leave because he was scared by Petersen's aggressive behavior that day and the day before. He testified that he held the machete down by his side when he exited the rental vehicle, and he denied swinging the machete at Petersen or raising it above his head. He also denied ever transferring it from his right hand to his left hand. Jacob testified that he would not have been able to do so because of an injury he received from a car accident in 1993 that limited the use of his left arm and hand. In her testimony, Inzauro confirmed Jacob's left arm and hand disability. Petersen recalled Inzauro having mentioned Jacob "receiving benefits" but testified that he had not been aware of Jacob's inability to use his left arm. According to Jacob, Petersen lunged at him and sustained his injuries when he grabbed the blade with both hands and tried to twist it out of Jacob's hand.

In contrast, Petersen testified that after hearing Stapp yell, he turned around and Jacob "came at [him] with a machete." Petersen testified that he put his hands up to protect himself. Stapp confirmed that Jacob swung the machete at Petersen. The physical altercation resulted in deep cuts to the outside of both Petersen's hands and cuts to his fingers. Petersen's left ring finger was "partially severed off." According to Petersen, at some point, Jacob switched the machete from his right hand to his left hand, after which Petersen "went after [Jacob's] left hand with [his] right hand, grabbed the sword, and took [Jacob] down and put him in a choke hold." Petersen and Jacob fell onto the grass beside the driveway. Petersen testified that he then called out to Stapp, who got out of his vehicle, took the machete away from Jacob, and moved it "off to the side."

According to Petersen, once Stapp disarmed Jacob, Petersen rolled off Jacob and kicked him toward the rental vehicle. Jacob testified that he managed to push Petersen off him after Stapp took the machete. Once Petersen and Jacob were separated, Jacob got in the rental vehicle, drove into the front yard around Stapp's vehicle, hitting it as he returned to the driveway, and left the scene. Stapp then called the police and an ambulance. Petersen was taken to the hospital and had surgery to reattach his finger. Petersen testified that as of the time of trial, he had not regained full movement of his left ring finger despite surgery and 3 or 4 months of physical therapy.

At the conclusion of evidence on February 3, 2025, the district court took the matter under advisement; it then announced its decision from the bench the following day. In finding Jacob guilty beyond a reasonable doubt of both charges, the court stated:

> Basically, there were inconsistencies in the evidence as to what happened. And there are always inconsistencies with regard to my [sic] witnesses. But the consistencies were that . . . Jacob decided to bring a machete to this discussion, argument, and then injured . . . Petersen with that by swinging it at him. The Court believes that these wounds of . . . Petersen were defensive wounds, not just trying to grab the machete. [Stapp] testified that he yelled 'look out.' He also testified that he saw . . . Jacob swing the machete at . . . Petersen. And notwithstanding whether he swung or not, which the Court believes and finds that he did, once [Jacob] brought the machete to this matter . . . Petersen had the right

- 4 -

to defend himself. . . . Petersen also understood that . . . Jacob could be violent. He thought there was a protection order against . . . Jacob. All . . . Jacob had to do was to put the keys in the mailbox. The Court is confused and befuddled why . . . Jacob drove onto the driveway if his intention was to put the keys in the mailbox, as . . . the photograph of the area, clearly shows that the mailbox is on the street, it's nowhere near the house.

So based upon all that evidence, the Court finds the defendant guilty of these two charges.

The court ordered a presentence investigation report (PSR) and set the matter for sentencing.

On February 14, 2025, Jacob filed a motion for new trial, alleging that the verdict was not sustained by sufficient evidence and was contrary to law. Following a hearing, the district court entered an order on April 18, 2025, overruling the motion.

A sentencing hearing was held on April 22, 2025. The district court noted that it had received and reviewed the PSR, and it incorporated the sentencing memorandum from Jacob's attorney into the PSR. Counsel for both parties presented arguments as to the appropriate sentences, and Jacob exercised his right to allocution, expressing that he never intended to hurt anyone and explaining his disability. Petersen also made a statement, informing the court of the physical, emotional, and financial effects on him of the September 10, 2022, incident.

In imposing sentence, the district court stated:

I don't believe that you came . . . to the house that day to do anybody any harm, but you escalated quickly.

The whole thing was to drop off keys. You could have easily dropped off the keys the night before, but for some reason you didn't want to do that. And then you engaged . . . Petersen. . . . I found that you were the aggressor. The assistant with . . . Petersen . . . was the one that yelled at . . . Petersen to look out because you were just about to attack him. And then for some reason you decide to pull out a machete, and then all of a sudden everything escalated. And that's when . . . Petersen had to grab the machete in order to protect himself from serious injury which resulted in serious injury to his hands and just about loss to his thumb.

This also is not your first incident of something like this. You have a long history of assaults, thefts, driving under suspension. And even after this incident you were convicted of possession of controlled substance, assault and battery, domestic assault and battery, driving under suspension.

And, so, I understand the disabilities you have, but you sure don't live like you have disabilities. You kind of do what you want to do. And driving under suspension is very indicative of someone doing what they want to do. Because you're not able to drive, but you continue to drive.

As such . . . I find that you're not a candidate for probation.

The district court sentenced Jacob to consecutive terms of 6 to 10 years' imprisonment on the second degree assault conviction and 5 to 8 years' imprisonment on the use of a deadly weapon conviction with credit for 8 days' time served.

Jacob now appeals.

ASSIGNMENTS OF ERROR

Jacob assigns three errors, but the first and second assigned errors are identical. Restated, he assigns that the evidence was insufficient to support his convictions (error assigned twice) and that the district court erred in overruling his motion for new trial. Jacob also argues but does not assign that the court abused its discretion by imposing an excessive sentence. Absent plain error, an appellate court considers only those claimed errors both specifically assigned and specifically argued. *State v. Price*, 320 Neb. 1, 26 N.W.3d 70 (2025). Because Jacob did not specifically assign error to the sentences imposed, we proceed on a plain error review of his sentences.

STANDARD OF REVIEW

In reviewing a criminal conviction for sufficiency of the evidence, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. *State v. Adams*, 320 Neb. 316, 27 N.W.3d 23 (2025). The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*

An appellate court applies a de novo standard when reviewing a trial court's dismissal of a motion for new trial without conducting an evidentiary hearing, but it applies an abuse of discretion standard of review to appeals from motions for new trial denied after an evidentiary hearing. *State v. Garcia*, 318 Neb. 228, 14 N.W.3d 525 (2024).

An appellate court may find plain error on appeal when an error unasserted or uncomplained of at trial, but plainly evident from the record, prejudicially affects a litigant's substantial right and, if uncorrected, would result in damage to the integrity, reputation, and fairness of the judicial process. *State v. Cartwright*, 320 Neb. 619, 29 N.W.3d 769 (2026).

ANALYSIS

*Sufficiency of Evidence.*

Jacob assigns that the evidence was insufficient to support his convictions. He was convicted of second degree assault and use of a weapon (not a firearm) to commit a felony. A person commits second degree assault if he or she intentionally or knowingly causes bodily injury to another person with a dangerous instrument or recklessly causes serious bodily injury to another person with a dangerous instrument. § 28-309(1). And, any person who uses a deadly weapon, other than a firearm, to commit any felony which may be prosecuted in a court commits the offense of use of a deadly weapon to commit a felony. § 28-1205(1)(b). Jacob points to the district court's findings from the bench and argues that the court misunderstood what happened on September 9, 2022, the day before the incident, and based on that misunderstanding, "assigned blame to Jacob." Brief for appellant at 20. Jacob argues further that the court "substituted a 'but for' rule or 'cause in fact' standard for the standard of evidence beyond a reasonable doubt." *Id.* Jacob concludes, based on the court's stated findings that he was found guilty "because he did not simply drop off the key in the mailbox." *Id.* He also points to conflicts in the evidence, including Petersen's and

Stapp's testimony as to exactly where on the driveway the incident occurred and argues that the evidence lacked "probative force." Brief for appellant at 30.

We disagree with Jacob's interpretation of the district court's findings. The court began by unambiguously finding Jacob guilty of both charges "beyond a reasonable doubt." Despite some inconsistencies in the evidence as to what the exact sequence of events and Petersen's and Jacob's locations at various points during the altercation on the morning of September 10, 2022, the court found "the consistencies" in the evidence to be that Jacob brought a machete to "this discussion, argument" and that he injured Petersen with the machete by swinging it at him. The court specifically found that Petersen's wounds were defensive, not merely a result of him trying to grab the machete, and that Jacob did swing the blade at Petersen. The court went on to note its confusion over why Jacob had driven up the long driveway, parking closer to the house, when he would not have needed to do so to put the pickup keys in the mailbox, which was near the street.

The district court did not include a date in its statement from the bench about Jacob having pulled onto the driveway, and we do not read the court's comment about its confusion as a misunderstanding of what happened during Jacob's encounter with Petersen the evening before the incident. The evidence clearly shows that Jacob did pull onto the driveway on September 10, 2022, and we read the court's findings as relating to the events of that morning. The evidence supports a conclusion that on the morning of September 10, 2022, Jacob still needed to leave the keys for the pickup to be removed, but his plan for the pickup's removal and repair at that point differed from the plan relayed to Petersen by Inzauro. In fact, Jacob's own testimony reveals another purpose for his presence on the property that morning. Jacob acknowledged placing the machete in the vehicle he was driving that morning and testified that he was going to use it to cut down some of the plants or bushes in the front yard at the house. When asked why he would do that, he responded, "To hurt [Inzauro's] feelings, I guess."

The evidence was sufficient to support Jacob's convictions. Regardless of what Jacob originally planned for the machete on the morning of September 10, 2022, he admitted grabbing it instead of his cell phone from the vehicle during his verbal altercation with Petersen. Petersen and Stapp both testified that Jacob swung the machete at Petersen and that Petersen's injuries resulted when he held up his hands to defend himself. Jacob argues that Petersen's injuries were inflicted because he grabbed the machete blade directly to try to wrestle it away from Jacob. He essentially attacks the weight and credibility of the evidence against him. The district court, however, found the version of events testified to by Petersen more credible than Jacob's, and it resolved the inconsistencies in the evidence against Jacob, all of which were matters for the trier of fact. See *State v. Adams*, 320 Neb. 316, 27 N.W.3d 23 (2025) (appellate court does not resolve conflicts in evidence, pass on credibility of witnesses, or reweigh evidence; such matters are for finder of fact).

Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found Jacob guilty of second degree assault and use of a weapon (not a firearm) to commit a felony, and we see nothing to indicate that the court applied an incorrect standard for finding Jacob guilty of the charges. This assignment of error fails.

*Motion for New Trial.*

Jacob assigns that the district court erred in overruling his motion for new trial. He again argues that the court misunderstood the evidence with respect to Jacob's interaction with Petersen on September 9, 2022. He argues that this purported misunderstanding "had a cascading effect on the outcome of the case," "clouded" the court's "ability to properly judge the evidence," and that the court should have "modified its decision" once the "mistake" was pointed out to the court in the motion for new trial proceedings. Brief for appellant at 36. As set forth above, we do not read the court's oral findings as a misunderstanding of the evidence. Given our resolution of Jacob's preceding assignment of error, we need not address this assignment of error further. An appellate court is not obligated to engage in an analysis that is not needed to adjudicate the controversy before it. *State v. Adams, supra*.

*Excessive Sentence.*

Jacob argues that the district court imposed excessive sentences and that it failed to consider the relevant sentencing factors. Jacob did not specifically assign error to the sentences imposed. We have reviewed his sentences for plain error and find none. Generally, an appellate court will find plain error only when a miscarriage of justice would otherwise occur. *State v. Molina*, 320 Neb. 544, 28 N.W.3d 837 (2025). A sentence that is contrary to the court's statutory authority is an appropriate matter for plain error review. *Id.*

The district court sentenced Jacob to consecutive terms of imprisonment of 6 to 10 years for his conviction of second degree assault and 5 to 8 years for his use of a weapon conviction. These sentences are within the statutory limits. See, Neb. Rev. Stat. § 28-105 (Cum. Supp. 2024); § 28-309; § 28-1205(1)(b). At the sentencing hearing, the court noted that it had reviewed the PSR. It accepted the sentencing memorandum offered by Jacob's attorney and heard arguments from the parties' attorneys, as well as statements by both Jacob and Petersen. In sentencing Jacob, the court noted the circumstances of the crimes, Jacob's past criminal history, and his disability. The court specifically found that Jacob was not a candidate for probation. There is nothing in the record to indicate that the court considered inappropriate factors in sentencing Jacob. See *State v. Rejai*, 320 Neb. 599, 29 N.W.3d 225 (2026) (in determining sentence to be imposed, relevant factors customarily considered and applied are defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for offense, as well as (7) nature of offense and (8) amount of violence involved in commission of crime). Finding no plain error, we affirm the sentences imposed.

CONCLUSION

The evidence was sufficient to support Jacob's convictions, and the district court did not abuse its discretion in denying his motion for new trial. We find no plain error in Jacob's sentences. Accordingly, we affirm.

AFFIRMED.